**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 28 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MAURINE V. O'SHEA,

       Plaintiff - Appellant,

v.

YELLOW TECHNOLOGY
SERVICES, INC., a Delaware
corporation,

       Defendant - Appellee.

No. 97-3387

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 96-CV-2370)

---

James E. Kunce, Overland Park, Kansas, for Plaintiff-Appellant.

Robert W. McKinley (Tedrick A. Housh III with him on the brief), Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Kansas City, Missouri, for Defendant-Appellee.

---

Before **KELLY**, **McKAY**, and **LUCERO**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Plaintiff Maurine V. O'Shea filed this action against her employer, Defendant Yellow Technology Services, Inc., alleging hostile environment sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the Kansas Acts Against Discrimination, Kan. Stat. Ann. §§ 44-1001 to 44-1044. Plaintiff claimed that sexual harassment by her fellow employees and supervisors was so severe and pervasive that it amounted to a hostile work environment which caused her to quit her job.[1] The district court granted Defendant's motion for summary judgment. See O'Shea v. Yellow Tech. Servs., Inc., 979 F. Supp. 1390 (D. Kan 1997). It first concluded that there was evidence from which a jury could find that a coworker's derogatory comments about women and his statements to other coworkers that Plaintiff was planning to file a sexual harassment suit against him were "based on [P]laintiff's gender or sexual animus." Id. at 1396. The court ultimately determined, however, that this conduct was neither pervasive nor severe enough to amount to an objectively hostile work environment. The decision was based in part on the court's determination that the other evidence of hostility in the record was unrelated to gender or sexual animus, because it believed that "[o]nly . . . conduct which . . . has [been] found to be based upon gender or sexual animus [should] be

_____

[1]Plaintiff also filed a hostile environment age discrimination claim, but the district court granted summary judgment to Defendant on this claim. Plaintiff does not challenge this ruling on appeal. See Appellant's Br. at 2.

considered" in evaluating the severity and pervasiveness of the conduct. Id. It subsequently denied Plaintiff's motion for reconsideration, and Plaintiff appeals the grant of summary judgment in favor of Defendant.

On appeal, Plaintiff argues that she presented sufficient genuine issues of material fact to survive summary judgment on the issue of whether the alleged harassing conduct was based on gender or sexual animus. She also claims that genuine issues of material fact regarding the severity and pervasiveness of the conduct should have precluded summary judgment. Thus, the critical issue is whether, examining all of the evidence and reasonable inferences therefrom in a light most favorable to Plaintiff, a jury reasonably could infer that a hostile work environment existed and that it had a reasonable nexus to the sexual and gender-based harassment Plaintiff suffered.

We review de novo a district court's grant or denial of summary judgment, and we apply the same legal standard employed by the district court pursuant to Federal Rule of Civil Procedure 56(c). See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). In reviewing such dispositions, this court repeatedly has emphasized that we must draw all inferences in favor of the party opposing summary judgment. See, e.g., Trujillo v. University of Colo. Health Sciences Ctr., 157 F.3d 1211, 1213 (10th Cir. 1998) (stating that in reviewing summary judgment disposition, court draws all reasonable inferences in favor of

nonmoving party); Curtis v. Oklahoma City Pub. Sch. Bd. of Educ., 147 F.3d

1200, 1214 (10th Cir. 1998) ("In determining whether a genuine issue of material

fact exists, the court must draw all reasonable inferences in favor of the

nonmoving party.").  In this respect, we must view the evidence in context, not

simply in its segmented parts.  Recently we described the inquiry governing the

evaluation of hostile work environment claims as follows:  "[T]he existence of

sexual harassment must be determined 'in light of the record as a whole,' and the

trier of fact must examine the totality of the circumstances, including 'the context

in which the alleged incidents occurred.'"[2]  Penry v. Federal Home Loan Bank of

Topeka, 155 F.3d 1257, 1262 (10th Cir. 1998) (quoting Meritor Savings Bank v.

Vinson, 477 U.S. 57, 69 (1986)), cert. denied, __ U.S. __, 119 S. Ct. 1334 (1999).

Such a thorough examination of the record is required because "the very term

'environment' indicates that allegedly discriminatory incidents should not be

examined in isolation."  Id.  Under this interpretation, because conduct which is

not gender-based may form a part of the context or environment in which the

---

[2] Plaintiff also asserts that such conduct must be independently evaluated on a case-by-case basis, rather than by simply comparing the facts alleged to the conduct described in reported cases.  See Appellant's Br. at 39, 41.  Although we routinely compare the facts of different cases to each other to evaluate the relative severity or pervasiveness of the conduct, our precedents require us to examine the specific context in which the conduct occurred on a case-by-case basis.  It is in this sense that our evaluation of the facts of each case is "independent."  Thus, Plaintiff's argument that new standards are required to provide for an independent evaluation of the conduct is inapposite.

discriminatory conduct is alleged to have occurred, such conduct may be relevant to, and should be considered in, evaluating a hostile work environment claim. In Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987), for example, we held that "[e]vidence of a general work atmosphere . . . —as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." Thus, even if some of the alleged conduct was not "'explicitly sexual in nature,'" Smith v. St. Louis Univ., 109 F.3d 1261, 1265 (1997) (citation omitted), if it reasonably could be inferred that the conduct was related to gender or arose out of a context in which admittedly sex- and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn. See Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (explaining that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant").

Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct. See Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994) (noting that, in determining whether the proponent of a hostile work environment claim has

demonstrated racial animus, the court considers "the totality of the circumstances

and therefore consider[s] the racial comments along with the general ridicule of

[plaintiff] by the other coworkers"). We agree with the Eighth Circuit which

recently addressed the relevance of facially neutral conduct in the context of a

race and sex discrimination action and held that

> racial epithets are often the basis of racial harassment claims[] and
> may likewise create an inference that racial animus motivated other
> conduct as well.
>
> All instances of harassment need not be stamped with signs of
> overt discrimination to be relevant under Title VII if they are part of
> a course of conduct which is tied to evidence of discriminatory
> animus. Harassment alleged to be because of sex need not be
> explicitly sexual in nature.

Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir. 1999) (citations omitted).

Of course,

> [f]or a hostile environment claim to survive a summary judgment
> motion, "a plaintiff must show that a rational jury could find that the
> workplace is permeated with discriminatory intimidation, ridicule,
> and insult[] that is sufficiently severe or pervasive to alter the
> conditions of the victim's employment and create an abusive working
> environment."

Penry, 155 F.3d at 1261 (quoting Davis v. United States Postal Serv., 142 F.3d

1334, 1341 (10th Cir. 1998)); see Meritor, 477 U.S. at 67. The severity and

pervasiveness of the conduct must be judged from both an objective and a

subjective perspective.[3]  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).  "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S. Ct. 998, 1003 (1998) (citation omitted).  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances . . . [,] includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23.  Finally, we note that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is "'quintessentially a question of fact.'"  Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994) (citation omitted); cf. Smith, 109 F.3d at 1264 (stating that "'summary judgment should seldom be used in employment discrimination cases'" (quoting Crawford, 37 F.3d at 1341)).

The evidence and reasonable inferences viewed in favor of Plaintiff show that she began her employment with Defendant in June 1991.  She was a satisfactory employee who received a promotion to systems programmer specialist

_____

[3]Neither party appears to take issue with whether Plaintiff subjectively found her work environment to be hostile.  Accordingly, we do not address this aspect of the district court's summary judgment determination.

within sixteen months after she was hired.  Her responsibilities included upgrading and maintaining the products associated with the MVS mainframe operating system and assisting with tape and disk storage management for the MVS mainframe system.

In January 1994, Plaintiff joined the team of systems programmers working on UNIX operating systems.  She was the only systems administrator on the UNIX team.  Vicky Lynn Logan was the UNIX team leader.  Her responsibilities included managing the workload and assisting in employee evaluations.  Based on her experience working with and evaluating Plaintiff, Ms. Logan concluded that Plaintiff "was a very competent systems programmer, . . . a team player, . . . cooperative, and that she was neither a trouble maker, nor did she have a volatile personality."  Appellant's App. at 224.

In February 1994, Defendant began implementing a project called FileNet, which was a program installed on UNIX operating systems.  Sometime between February and April 1994, Gary Jones joined Plaintiff's team as a UNIX systems administrator.  Because Mr. Jones' responsibilities centered on providing technical support in connection with FileNet, he did not supervise Plaintiff.  In March 1994, Plaintiff told Joe Searle, the manager of systems programming, that she was glad she had joined the UNIX team because she was learning new team dynamics.  See id. at 94.  However, Plaintiff and Mr. Jones began to experience

conflicts in their working relationship shortly after he joined the team. Both Ms. Logan and Mr. Searle noticed the problem. See id. at 57, 62.

Plaintiff alleges that numerous instances of harassing conduct by Mr. Jones created a hostile work environment which prevented her from working effectively with other members of the team. For example, Plaintiff alleges that she overheard Mr. Jones making fun of his wife and making other derogatory comments about women such as that women talk too much and are less intelligent than men. See id. at 204. Plaintiff also alleges that Mr. Jones told others she was incompetent and unable to do her job, see id. at 166, that she was overemotional and hysterical, see id. at 204, and that women in general were incompetent, stupid, and scatterbrained. See Appellant's Br. at 7. Plaintiff further claimed that, on one occasion, she heard Mr. Jones tell some coworkers about a dream he had in which he was watching a woman jumping naked on a trampoline. Mr. Jones described to his coworkers how the woman's breasts looked. See Appellant's App. at 174. On another occasion, Mr. Jones allegedly said, "Playboy is superior to a wife because at least with Playboy you get variety." Id. Plaintiff also alleges that she and Mr. Searle both overheard another coworker, who was doing an impression of Mr. Jones, state, "I just don't get it. I treat women like crap and they just keep coming back for more." Id. Finally, Plaintiff alleges that Mr. Jones repeatedly told his coworkers that Plaintiff was going to file a sexual

harassment lawsuit against him, see id. at 204, which, according to Plaintiff, caused her coworkers to cut off contact with her and treat her poorly. Finally, in addition to Mr. Jones' conduct, Plaintiff testified during her deposition that Dan West and Ed Haffner, two other members of the UNIX team, "made derogatory comments about women jokingly all the time." Id. at 38.

The district court quite properly concluded that a jury could find that Mr. Jones' derogatory comments about women and his statements to coworkers and others that Plaintiff was going to file a sexual harassment suit against him were based on gender or sexual animus. See O'Shea, 979 F. Supp. at 1395. Further, we think that a jury readily could find Mr. West's and Mr. Haffner's derogatory comments about women to be related to gender or sexual animus. We cannot agree, however, with the court's conclusion that the incidents in which Mr. Jones compared his wife to a Playboy magazine and described a dream about a naked woman jumping on a trampoline were unrelated to gender or sexual animus. Even though these statements may not have been directed specifically at Plaintiff, they nonetheless "have gender-related implications[] [and] we cannot, with straight faces, say that [this conduct] had nothing to do with gender." Penry, 155 F.2d 1263. Because of the overtly sexual nature of these incidents, we think a jury readily could find that they were based on gender or sexual animus.

Moreover, we think that a jury reasonably could find that the obviously sex-

-10-

and gender-related conduct engaged in by Mr. Jones, Mr. West, and Mr. Haffner created or contributed to a work environment that was charged with gender bias and sexual animus. See Oncale, 118 S. Ct. at 1003 (stating that evaluation of hostile environment claim "requires careful consideration of the social context in which the particular behavior occurs and is experienced by its target"); Penry, 155 F.3d at 1262 (explaining that fact finder in a sexual harassment case should not "'examine each alleged incident of harassment in a vacuum[] [because w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents.'" (citation omitted)). In light of this work environment, we think that Plaintiff has at least established genuine issues of material fact as to whether the following conduct was based on gender or sexual animus.

Plaintiff alleges that the general work atmosphere was hostile towards women and that Mr. Jones' conduct caused other employees to ostracize her and otherwise impede her efforts to perform her work. For example, apart from her first day on the job, male programmers never invited Plaintiff to lunch outside of the office unless she invited herself. See Appellant's App. at 162. Plaintiff further claims that when she would approach a group of male programmers who were discussing technical matters, they would shift the subject of their discussion to matters such as golf, tennis, or running. See id. at 162-63. She also claims

-11-

that two UNIX coworkers, Charles Bockting and Glenn Richards, became generally less communicative with her, and that, after Mr. Jones joined the team, they totally ignored her on one occasion when she attempted to discuss the FileNet project with them. See id. at 191. On an unspecified date, one of Plaintiff's coworkers, David Corwin, entered her cubicle and shouted that Plaintiff was doing things incorrectly and was "going to screw up the whole system." Id. at 185. In addition, Plaintiff claims that when her supervisor, Ted Keller, was interviewing a female programmer, he told Plaintiff that they would not be able to hire the programmer because "she would [not] fit into the corporate culture," id. at 179, and because Defendant would have had to bring the woman in at a higher salary level than it would have had to pay a specific male programmer.

Because of the difficulties Plaintiff was experiencing with her coworkers in general and with Mr. Jones in particular, she and Ms. Logan repeatedly told Mr. Searle, Mr. Corwin, Mr. Keller, and Human Resources Manager Jim Fleming about the difficulties and their effects on Plaintiff's and the team's work performance. See id. at 224. According to Plaintiff's allegations, nearly all of these complaints were met with indifference, if not resistance. For example, even though both Plaintiff and Ms. Logan complained about Plaintiff's not being provided with the password to the FileNet system, which she needed for her work, Plaintiff still was not given the password. When Plaintiff pointed out to Mr.

Searle that less experienced male employees had the passwords, he responded by saying, "This is not a male-female issue." Id. at 190. Additionally, on June 3, 1994, Plaintiff told Mr. Searle that Mr. Jones was not explaining the installation process for FileNet equipment to her. Mr. Searle told Plaintiff that she should get more involved in the project if she believed she needed to know about it. On June 16, 1994, Plaintiff complained to Mr. Searle that Mr. Jones was allowed to attend a programming class but that she was not. She also told Mr. Searle that Mr. Jones did not communicate with her, that the male employees thought they were better than she was, and that, because of these problems, she was having difficulty performing her work duties.

In late July 1994, Ms. Logan called a team meeting to assess the difficulties between Plaintiff and the other members of the team. She determined that two of the team members, Rob Sakmar and Adam VonNeida, had ceased virtually all contact with Plaintiff because of Mr. Jones' statements that Plaintiff was going to file a sexual harassment suit, and she informed the team that no further negative comments about Plaintiff would be acceptable. See id. at 230. Ms. Logan stated that after this meeting the team members generally became uncooperative with her, which affected her work and personal life. See id. at 225. During a different meeting, Ms. Logan told Mr. Corwin and Mr. Keller that she thought the situation was entirely Mr. Jones' fault and that Plaintiff was not only competent but that

-13-

she had done "an *exceptional* job." Id. at 231.

On August 1, 1994, Plaintiff met with Mr. Corwin, Mr. Keller, and Mr. Jones to discuss her allegedly ongoing problems with Mr. Jones and the other team members. Although Plaintiff requested that Mr. Fleming attend the meeting, Mr. Corwin denied the request, saying that they wanted to handle the issue themselves. See id. at 173. During the meeting, Plaintiff told Mr. Jones about her concerns. He responded by saying that he was not quite sure what he might have done, but he was sorry if he had done anything wrong. See id. at 211. Although Mr. Keller testified in his deposition that the meeting ended when he told Mr. Jones that if he were making derogatory comments he should stop, see id., Plaintiff testified that the meeting ended when Mr. Keller turned to her, raised his voice, and reprimanded her for being uncooperative and uncommunicative. See id. at 180.

In spite of Plaintiff's and Ms. Logan's attempts to improve Plaintiff's relations with her coworkers, the situation continued to worsen. According to Plaintiff's allegations, her supervisors not only refused to take effective steps to remedy the situation but also belittled and refused to acknowledge her complaints. Specifically, Plaintiff alleges that she again told Mr. Keller that the situation with Mr. Jones was preventing her from doing her job, but, according to Plaintiff, Mr. Keller refused to acknowledge any problem and told Plaintiff to take a vacation

-14-

and get a tan.  See id. at 177.  Plaintiff alleges that another discussion she had with Mr. Keller in early August 1994 ended when he yelled at her, "Can't you see that you're the problem?"  Id. at 178.  In response, Plaintiff told Mr. Keller that she quit, and she then went to Mr. Fleming's office.  After discussing her concerns with Mr. Fleming, Plaintiff rescinded her resignation and agreed to provide weekly status reports about any ongoing problems with Mr. Jones.

The incidents leading to Plaintiff's resignation illustrate the continuing tension between Plaintiff, her coworkers, and her supervisors.  On August 24, 1994, during a lunch with Plaintiff and Mr. Keller, Mr. Richards allegedly stonewalled Plaintiff by refusing to communicate with her and by responding to her questions only with monosyllabic answers.  Later the same day, Mr. Richards refused to provide Plaintiff with a file she needed for her work.  See id. at 172.  As a result, Plaintiff went to Mr. Keller's office to ask for his assistance.  Mr. Keller became angry and took Plaintiff and Mr. Richards to Mr. Fleming's office to discuss the situation.  Mr. Fleming began to talk to Plaintiff about team work and sharing information, but Plaintiff explained that she was trying to get others to be team players.  At that point, Mr. Fleming yelled, "What I see before me is an extremely paranoid person totally lacking in self-confidence."  Id.  Plaintiff alleged that Mr. Fleming's comment made her feel that she had "absolutely no support" from her supervisors and that, as a result, she "gave up."  Id.  She stated,

"I will see you in court," and then went to Mr. Searle's office and informed him, "I'm not going to put up with it any longer. I'm gone." Id. Later that day, Plaintiff submitted a letter of resignation to Mr. Searle and provided copies to Mr. Keller and Mr. Fleming. At about 5:00 p.m. on the same day, Mr. Fleming called Plaintiff at her home and left a message apologizing for losing his temper and raising his voice earlier in the day.

Six days later, on August 30, 1994, Ms. Logan resigned her employment with Defendant. In early August, Ms. Logan had begun to feel that the "situation [between Plaintiff and Mr. Jones] was explosive," id. at 230, and that "her own situation [had] continued to deteriorate to the point where [she] no longer wished to remain at Yellow." Id. at 231. Thus, she told Mr. Corwin that she "could no longer function as team leader because the other members of the 'team' were completely uncooperative in providing the information [she] needed to perform [her] job." Id. at 230.

Having reviewed this evidence, we think the record fairly supports the inference that Mr. Jones' numerous derogatory comments about women and his statements that Plaintiff was going to file a sexual harassment complaint against him, along with Mr. West's and Mr. Haffner's derogatory comments about women, caused or contributed to a hostile work environment which was based on Plaintiff's gender or sexual animus. More specifically, it is reasonable to infer

that this conduct caused other employees who worked with Plaintiff to ignore her, withhold information and passwords from her, refuse to discuss technical matters with her, and generally become uncooperative with her. In particular, a jury could find that the following events would not have occurred but for Plaintiff's gender: Mr. Jones' alleged failure to communicate adequately with Plaintiff regarding work matters and his statements to coworkers and others that Plaintiff was incompetent; Plaintiff's claims that her male coworkers rarely or never invited her to lunch and that they ignored her or stopped discussing technical matters when she approached; her allegation that her coworkers and supervisors refused to give her the password she needed to do her work; her allegations that Mr. Keller and Mr. Corwin yelled at her in a demeaning and unprofessional manner on several occasions; and Mr. Corwin's alleged statement telling Plaintiff to take a vacation and get a tan. Additionally, while they present closer questions, a jury might reasonably infer that gender or sexual animus was the source of Defendant's decision to send Mr. Jones rather than Plaintiff to a programming class and of Mr. Keller's statement that Defendant would not hire a specific female candidate because she would not fit into the corporate culture. Moreover, many of Plaintiff's factual allegations are corroborated by the deposition and written declaration of Ms. Logan. At the very least, the non-sexually explicit or non-gender motivated conduct which occurred after Mr. Jones

began working on the UNIX team is relevant to the evaluation of Plaintiff's hostile work environment claim. See Penry, 155 F.3d at 1263 ("Even where the motive behind the alleged conduct was not the plaintiff's gender, the court may still consider that conduct relevant when evaluating whether ambiguous conduct was in fact gender-motivated or whether gender- motivated conduct was so severe and pervasive as to create Title VII liability."). We therefore conclude that Plaintiff has presented genuine issues of fact as to whether "she was the object of harassment because of her gender." Penry, 155 F.3d at 1261.

In summary, we believe that the obviously sex- and gender-motivated conduct—including Mr. Jones' comparison of his wife to a Playboy magazine, his description of his dream, his remarks that Plaintiff was going to file a sexual harassment suit against him, and Mr. Jones' and others' derogatory comments about women—so poisoned the entire body of conduct toward Plaintiff that a jury reasonably could view *all* of the allegedly harassing conduct occurring after Mr. Jones began working for Defendant as the product of sex and gender hostility. That is particularly so when the conduct is viewed against the evidence that until the onset of the sex and gender harassment Plaintiff was viewed as a good employee who got along well with others. While there is some evidence to the contrary, including some pre-Jones harassment, the district court may not resolve disputed questions of fact at the summary judgment stage; these questions are for

the jury to resolve.  See Concrete Works of Colo., Inc. v. City and County of Denver, 36 F.3d 1513, 1518 (10th Cir. 1994); Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir. 1992).

Plaintiff has also established genuine issues of material fact regarding the severity and pervasiveness of the conduct.  Viewed in a light most favorable to Plaintiff, the record shows that once Mr. Jones started working on the UNIX team the allegedly harassing conduct began to permeate Plaintiff's work environment.  Throughout the remaining five months of Plaintiff's employment, Mr. Jones continued his demeaning conduct unabated.  He allegedly made frequent derogatory comments about women, he told people that Plaintiff was incompetent, he refused to cooperate and share work information with Plaintiff, and he made at least two overtly sexual comments so that Plaintiff could hear them.  Further, Mr. Jones allegedly repeatedly told his coworkers that Plaintiff was going to file a sexual harassment complaint against him.  Based on this evidence, we think that a jury reasonably could conclude that, as a result of Mr. Jones' and others' conduct, Plaintiff was subjected to an environment "permeated with 'discriminatory intimidation, ridicule, and insult.'"  Davis, 142 F.3d at 1341 (citation omitted).  We therefore hold that Plaintiff established genuine issues of material fact regarding whether the alleged conduct was "'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working

environment.'" Id. (citation omitted).

We REVERSE the district court's grant of summary judgment and

REMAND for further proceedings consistent with this opinion.[4]

---

[4]Defendant raised two additional issues in its brief, namely whether Defendant is liable for Mr. Jones' alleged conduct and whether Plaintiff was constructively discharged. Because the trial court did not consider these issues in disposing of Plaintiff's claims on summary judgment, we do not address them here.