**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 30, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DELSA BROOKE SANDERSON,

     Plaintiff - Appellant,

v.

WYOMING HIGHWAY PATROL,

     Defendant - Appellee.

No. 19-8025

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:18-CV-00016-SWS)**
_____

Bruce T. Moats, Law Office of Bruce T. Moats, P.C., Cheyenne, Wyoming, for Plaintiff-Appellant.

Jesse B. Naiman, Assistant Attorney General (Michael J. McGrady, Deputy Attorney General, on the brief), Cheyenne, Wyoming, for Defendant-Appellee.
_____

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

In this action, Delsa Brooke Sanderson brought three claims against her employer, Wyoming Highway Patrol ("WHP"), under Title VII of the Civil Rights Act of 1964. Two of those claims—for retaliation and hostile work environment

based on sex—are at issue on appeal.[1]  WHP moved for summary judgment on all claims against it.  In ruling on WHP's motion for summary judgment, the district court dismissed Sanderson's retaliation claim without prejudice because Sanderson had failed to exhaust her administrative remedies.  The district court then granted WHP's motion for summary judgment on Sanderson's hostile work environment claim, concluding that Sanderson had not carried her burden of showing discrimination that was "sufficiently severe or pervasive."  See Medina v. Income Support Div., 413 F.3d 1131, 1134 (10th Cir. 2005).  Sanderson appeals both of those rulings.

Sanderson also appeals the district court's order granting WHP's motion to exclude Sanderson's designated expert witness, Linda Forst.  The magistrate judge granted that motion, concluding that Forst's testimony was neither reliable nor relevant; the district court then affirmed that order.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's dismissal of Sanderson's retaliation claim, and we AFFIRM the court's order granting WHP's motion to exclude Sanderson's designated expert witness.  However, we REVERSE the court's summary judgment ruling on Sanderson's hostile work environment claim and REMAND for further proceedings.

---

[1] Sanderson also brought a claim for discrimination based on sex.  Sanderson's discrimination claim proceeded to trial, and the jury entered a verdict in favor of WHP.  That claim is not at issue here.

2

## I. BACKGROUND

Delsa Brooke Sanderson joined the Wyoming Highway Patrol in 2007. Sanderson performed well during the first seven years of her career, earning numerous positive reviews, a nomination for Trooper of the Year in 2014, and a Colonel's Commendation Award.

Notwithstanding her strong performance, Sanderson faced obstacles as a woman in law enforcement. She endured rumors of sexual promiscuity and was called the "division bicycle," implying that she had sex with many of her colleagues. (Aplt. App. 107–08) She found it difficult to cultivate male friendships without rumors surfacing that she was having sex with those friends. Sanderson also faced rumors that she flirted and used sex to gain advantages like getting a new patrol car. In general, Sanderson faced resistance from her male colleagues because she is "a very assertive, direct individual, and as a female it's even a little bit harder to take." (Aplt. App. 304)

In 2015, Sanderson was promoted to Division O, which is tasked with protecting the governor and the state legislature. She was trained as WHP's first female K9 handler, and she was assigned to sweep the Wyoming legislature for explosives.

Sanderson faced resistance from her colleagues on Division O. When Sanderson joined the team, some troopers expressed the view that "Division O as a whole does not accept females." (Aplt. App. 324) A rumor circulated that Sanderson had obtained the position because she was having an affair with someone in a

leadership position. Such rumors were repeated "quite routinely" and speculated about Sanderson having an affair with various leaders: "It went from captain to major, or, you know, someone different." (Aplt. App. 312–13) On more than one occasion, a rumor circulated that Sanderson had exchanged text messages of a sexual nature with a captain who supervised Division O.

On two occasions, Sanderson was accused of developing inappropriate relationships with individuals outside of Division O. A lieutenant reprimanded her for being too "familiar" with the deputy chief of staff to the governor. (Aplt. App. 495) The same lieutenant informed her that she had been accused of flirting with a local law enforcement officer during the governor's visit to the National High School Rodeo.

On one occasion, after being reprimanded for not timely answering her radio, Sanderson responded to a radio call while she was in the bathroom. When the trooper that made the call learned that she had been in the bathroom, the trooper told Sanderson not to answer the radio when she was "douching." (Aplt. App. 107)

In general, Sanderson felt ostracized by her colleagues. Sanderson recounted several instances in which she felt ignored. First, Sanderson recalled that the K9 team ignored her greetings while the team was at a conference in San Diego. Second, at a public event, two troopers were standing together. When Sanderson approached them to talk, one trooper immediately walked away. Sanderson asked the other how he was doing; the

4

trooper replied, "good," then turned and walked away. (Aplt. App. 294–95) Third, Sanderson approached two troopers who were typing at a desk and talking to each other. The troopers had their backs to Sanderson. Three times Sanderson repeated "hey, guys, I got a question." When neither trooper responded, Sanderson went around the desk to make eye contact. She repeated "I got a question." One trooper said, "What's your question, Brooke?" She asked her question, and the same trooper responded, "Well, I don't know. Jonathan, do you know? Huh?" Then both troopers got up and left. (Aplt. App. 298–99) Fourth, Sanderson brought cinnamon rolls for the team to enjoy during a morning training. When she arrived at the training, she found that another team member had brought burritos for each team member except Sanderson.

In light of her treatment, Sanderson considered quitting. She sent a text message to a supervisor that read: "I have had enough of being treated like shit by my co workers. It's no wonder no female makes it in the O division. The guys in the division make it down right miserable for any female." (Aplt. App. 192–93) Sanderson spoke with supervisors on at least four occasions about the challenges she was facing with her colleagues on Division O.

On February 16, 2016, an incident occurred during a training exercise that would trigger Sanderson's demotion. Sanderson was working with Mark Rispoli, a dog trainer that contracted with WHP. Parts of the training were going poorly and frustrations were rising. At one point, Sanderson told

Rispoli to stop being an "asshole." After that incident, Sanderson was disciplined, and on April 15, 2016, Sanderson was removed from Division O and demoted to her prior position. (Aplt. App. 218–28) Throughout this litigation, WHP has argued that Sanderson was not a good fit for Division O because she was abrasive, abrupt, and generally a poor communicator.

On October 27, 2016, Sanderson filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). She received a right to sue letter on October 19, 2017. Sanderson then initiated this lawsuit against WHP.

## II. DISCUSSION

### A. Retaliation

In ruling on WHP's motion for summary judgment, the district court dismissed Sanderson's retaliation claim without prejudice because she had failed to exhaust her administrative remedies. This court "review[s] the district court's legal determination that a plaintiff has failed to exhaust her administrative remedies de novo." Smith v. Cheyenne Ret. Inv'rs L.P., 904 F.3d 1159, 1164 (10th Cir. 2018).

Sanderson's retaliation claim arises under Title VII of the Civil Rights Act of 1964, which provides that it is unlawful "for an employer to discriminate against any of his [or her] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224 (10th Cir. 2008) (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue-letter."

6

Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1181 (10th Cir. 2018) (quoting Foster v. Ruhrpumpen, Inc., 365 F.3d 1191, 1194 (10th Cir. 2004)). That requirement, known as the exhaustion rule, "derives from two principal purposes: '1) to give notice of the alleged violation to the charged party; and 2) to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance.'" Smith, 904 F.3d at 1164 (quoting Ingels v. Thiokol Corp., 42 F.3d 616, 625 (10th Cir. 1994), abrogated on other grounds by Martinez v. Potter, 347 F.3d 1208 (10th Cir. 2003)).

"To advance these purposes . . . [a] plaintiff's claim in court 'is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC.'" Id. (quoting MacKenzie v. City and Cty. of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005), abrogated on other grounds by Lincoln v. BNSF Ry. Co., 900 F.3d 1166 (10th Cir. 2018)). The EEOC charge "must contain facts concerning the discriminatory and retaliatory actions underlying each claim." Id. (quoting Jones v. U.P.S., Inc., 502 F.3d 1176, 1186 (10th Cir. 2003)). This court has held, "time and again, that the reasonable and likely scope of the investigation is determined by the allegations contained in the Charge itself, rather than in the Charge and any responsive documents." Id. at 1165 (emphasis in original).

Sanderson filed her Charge of Discrimination with the EEOC on October 27, 2016. In her Charge of Discrimination, she articulated the following facts to support her retaliation claim:

7

7. I engaged in what in good faith I believed to be protected activity under Title VII;

     a.  I informed my employer I was . . . filing an [EEOC] complaint.

8. Subsequent to my protected activity I received a needs improvement score on my annual evaluation for poor judgment as a means of continuing the harassment against me.

(Aple. Supp. App. 38)  In her Complaint, however, Sanderson altered her theory of retaliation.  There, she alleged the follow facts to support her retaliation claim:

59. Sanderson undertook protected activity when she complained to Capt. Thomas and her Division O supervisors about unequal treatment by her all-male colleagues on the dog team and Division O.

60. Defendant took adverse action against Sanderson by disciplining and reassigning her.

(Aple. Supp. App. 10)  Those are two distinct theories of retaliation.  The EEOC Charge of Discrimination supports a theory of retaliation based on events that occurred <u>after</u> her demotion; that is, following her demotion she notified her supervisors that she intended to file a Charge of Discrimination, and as a result of that protected activity she subsequently received a poor performance evaluation in retaliation.  By contrast, her Title VII Complaint in court alleges that, <u>prior</u> to her demotion, she complained to her supervisors about unequal treatment, and that she was demoted as a result of those complaints.[2]

---

[2] Protected activities under Title VII "can range from filing formal charges to voicing informal complaints to superiors."  <u>Fye</u>, 516 F.3d at 1228 (quoting <u>Hertz v. Luzenac Am., Inc.</u>, 370 F.3d 1014, 1015 (10th Cir. 2004)).

8

WHP argues, and the district court agreed, that Sanderson's EEOC Charge of Discrimination did not raise any facts about her complaints to supervisors prior to her demotion, and it therefore did not put WHP on notice as to the theory of pre-demotion retaliation in Sanderson's Complaint. Sanderson argues that she did put WHP on notice as to her theory of retaliation by raising those facts in a subsequent responsive document. After Sanderson filed her Charge of Discrimination, WHP filed its Employer Position Statement on March 29, 2017. Sanderson responded to WHP's Position Statement on April 17, 2017. In that response, Sanderson noted that she complained to supervisors about unequal treatment on at least four occasions preceding her demotion. Sanderson now argues that those facts, raised in her response to WHP's position statement, put WHP on notice as to her theory of retaliation as alleged in her Complaint.

Sanderson's argument is inconsistent with Smith v. Cheyenne Retirement Investors L.P. In Smith, we clearly held that "the reasonable and likely scope of the investigation is determined by the allegations contained in the Charge itself, rather than in the Charge and any responsive documents." 904 F.3d at 1165. Sanderson argues that the exclusionary language in Smith was limited to responsive documents filed by the defendants, and that responsive documents filed by the plaintiff can enlarge the Charge itself. However, Sanderson misreads Smith. Smith unequivocally held that the scope of the investigation "is determined by the allegations in the Charge itself." Id. (emphasis omitted). That is, to determine the claim before the EEOC, one looks only to the Charge itself. To emphasize that point in the facts of

9

the case before it, the court in <u>Smith</u> noted that this would exclude the use of statements in a responsive document to enlarge the claim.  But the holding of Smith is clear, one looks only to the Charge filed with the EEOC to determine the scope of the plaintiff's claim.  To ensure fairness, a plaintiff must articulate facts to support her Title VII claim in the Charge itself.  Because Sanderson did not allege in her EEOC Charge the facts that she asserted in her district court Complaint, the district court properly dismissed her retaliation claim for failure to exhaust her administrative remedies.

## B. Expert Witness

Sanderson designated Linda Forst as an expert witness who, based on her own experience, would have testified about gender stereotypes in law enforcement.  WHP moved to exclude Forst's testimony, and the magistrate judge granted that motion.  Sanderson objected to the magistrate judge's order, and the district court affirmed the magistrate judge's ruling.  When a magistrate judge rules on a non-dispositive matter, the district court must "modify or set aside any part of the order that is clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a).  "In turn, we review the district court's final evidentiary ruling for abuse of discretion."  <u>Allen v. Sybase, Inc.</u>, 468 F.3d 642, 659 (10th Cir. 2006).  Under that standard, we "will find error only if the decision was 'arbitrary, capricious, whimsical or manifestly unreasonable,' or 'we are convinced that the [district court] made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" <u>F & H Coatings, LLC v. Acosta</u>, 900 F.3d 1214, 1223 (10th Cir. 2018) (quoting <u>United</u>

States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir. 2009)).  Sanderson has failed to

show that the district court abused its discretion.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

In essence, Rule 702 permits a court to admit expert testimony that is "both reliable

and relevant."  United States v. Rodriguez-Felix, 450 F.3d 1117, 1122 (10th Cir.

2006).  The reliability prong requires the court to determine whether the expert's

opinions are supported by sound reasoning and methodology.  F & H Coatings, LLC,

900 F.3d at 1222.  This is not only true for scientific experts; it applies with equal

force to experience-based experts.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.

137, 151 (1999).  The relevance inquiry encompasses Rule 702's requirement that the

evidence "[help] the trier of fact to understand the evidence or to determine a fact in

issue."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591 (1993) (quoting Fed.

R. Evid. 702).  In that sense, relevance is also referred to as helpfulness.  See id.  To

determine whether the testimony will help the trier of fact, courts consider, in part,

11

whether the testimony is "within the juror's common knowledge and experience." Rodriguez-Felix, 450 F.3d at 1123.

The district court concluded that Forst's testimony was neither reliable nor relevant. In her expert report, Forst offered three primary opinions:

1. "A culture exists in the Wyoming Highway Patrol that tolerates at best the presence of female officers, as evidenced by the rumors and talk of a sexual nature regarding Sanderson";
2. "Comments by her male colleagues that Sanderson is not a team player is typical of the kind of reaction that women pioneers in law enforcement often face"; and
3. "The vague accusations used to justify Sanderson's reassignment are commonly used to justify actions against women whose male colleagues refuse to accept them."

(Aple. Supp. App. 27) The district court first concluded that Forst's testimony was not reliable because Forst did not explain how her experience led to her conclusions. Next, the court concluded that Forst's testimony was not helpful because gender stereotypes are within the juror's common knowledge and experience.

Sanderson has failed to show that either conclusion was "arbitrary, capricious, whimsical or manifestly unreasonable," or that either conclusion "exceeded the bounds of permissible choice in the circumstances." F & H Coatings, LLC, 900 F.3d at 1223. In particular, as to the court's relevancy and helpfulness conclusion, we note that "where . . . expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally assist the trier of fact." Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994) (internal

quotation marks omitted). Because Sanderson has failed to show that the district court abused its discretion, we affirm the court's order granting WHP's motion to exclude Forst's testimony.

**C. Hostile Work Environment**

The district court ruled that WHP was entitled to summary judgment on Sanderson's hostile work environment claim because Sanderson's cited acts of harassment were not sufficiently severe or pervasive. On this issue, we reverse.

This court "review[s] a grant of summary judgment de novo and appl[ies] the same legal standard used by the district court under Fed. R. Civ. P. 56(c)." Timmons v. White, 314 F.3d 1229, 1232 (10th Cir. 2003). Under Rule 56, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"[3] Mitchael v. Intracorp, Inc., 179 F.3d 847, 856 (10th Cir. 1999) (quoting Law v. NCAA, 134 F.3d 1010, 1016 (10th Cir. 1998)). "A dispute is genuine 'if there is

---

[3] In its response brief, WHP notes that Sanderson's argument on her hostile work environment claim in her opposition to summary judgment was only two pages long. However, that is a misleading representation of the record. WHP filed a supplemental appendix, in which it included only two pages of argument from Sanderson's opposition. But WHP omitted the rest of Sanderson's opposition, including her "Disputed and Undisputed Facts" section. There, she raises essentially the same facts as she does in her opening brief on appeal, and she provides citations to exhibits to support those facts. The district court did not indicate that Sanderson's argument or evidence on that issue was inadequately presented. The issue is adequately presented before us, and certainly adequately challenged by WHP, so that we have authority to address it here.

13

sufficient evidence so that a rational trier of fact could resolve the issue either way.'" Crowe v. ADT Sec. Servs., Inc., 649 F.3d 1189, 1194 (10th Cir. 2011) (quoting Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)). "A fact is material 'if under the substantive law it is essential to the proper disposition of the claim.'" Id. "In determining whether a genuine issue of material fact exists, the court must draw all reasonable inferences in favor of the nonmoving party." Curtis v. Okla. City Pub. Sch. Bd. of Educ., 147 F.3d 1200, 1214 (10th Cir. 1998).

When reviewing a summary judgment ruling on a hostile work environment claim, we "must view the evidence in context, not simply in its segmented parts." O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1096 (10th Cir. 1999). "[T]he existence of sexual harassment must be determined in light of the record as a whole, and the trier of fact must examine the totality of the circumstances, including the context in which the alleged incidents occurred." Id. (quoting Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1262 (10th Cir. 1998) (internal quotation marks omitted)). "Such a thorough examination of the record is required because 'the very term "environment" indicates that allegedly discriminatory incidents should not be examined in isolation.'" Id. at 1097.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); Medina, 413 F.3d at 1134. "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."

14

Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005). To sustain a claim of hostile work environment under Title VII, "a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." Medina, 413 F.3d at 1134.

### 1. Hostile work environment caused by harassment based on sex

In order to show that she was harassed "because of her sex," id., a plaintiff may cite acts of harassment that are either facially sex based or facially sex neutral if context indicates that acts that may appear neutral in isolation could be understood by a jury to be part of an overall animus and pattern of sexual discrimination and harassment. "Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." O'Shea, 185 F.3d at 1097. "If it reasonably could be inferred that the conduct was related to gender or arose out of a context in which admittedly sex and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn." Id. In other words, it is ordinarily the province of the jury to decide whether facially sex-neutral conduct constitutes harassment based on sex.

Sanderson cites some acts that are facially sex-based. She presents evidence that, before she was promoted to Division O, Sanderson was called the "division bicycle," and she faced rumors that she flirted and used sex to obtain a new patrol car.

15

Those rumors were bolstered by repeated rumors she faced, both before and after her promotion, that she engaged in sexual relationships with colleagues and supervisors. After she was promoted to Division O, she faced additional rumors that she had flirted and used sex in the context of a male-dominated culture to obtain her new position. This is set in the sexually hostile culture that some Division O members expressed the view that "Division O as a whole does not accept females." (Aplt. App. 324.) During her time on Division O, she was also accused of flirting with non-colleagues that she encountered in the course of her duties; she was told not to answer her radio when she was "douching"; and rumors persisted that she engaged in sexual relationships with supervisors.

Sanderson also cites acts that, out of context, might appear facially sex neutral. During her time on Division O, Sanderson felt ostracized by her colleagues and presents evidence that her teammates ignored her at a conference and at a public event. She also presents evidence that at one morning training, a team member brought a breakfast burrito for every member of the team except Sanderson. These instances together make up the "environment" within Division O of the WHP. When considered alongside the facially sex-based incidents, a jury could find that other hostile acts, which were not explicitly sexual in nature, were nevertheless part of the sexual harassment against Sanderson and contributed to a sexually hostile work environment. This is particularly appropriate here in light of the evidence that "Division O as a whole does not accept females."

16

In addition, a jury could consider incidents that preceded Sanderson's assignment to Division O, even though her EEOC charge, and therefore her claim in the district court, only alleged a claim while she was assigned to Division O. Such precedent incidents could inform or elucidate the environment she faced in Division O. Such evidence would include that she was called the "division bicycle" and that she had used sex to obtain a new patrol car.

The Supreme Court in National Railroad Passenger Corp. v. Morgan wrote that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). Indeed, as we have observed, "the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation." O'Shea, 185 F.3d at 1097 (quoting Penry, 155 F.3d at 1262). In light of the unique nature of a hostile work environment claim, the Supreme Court in Morgan held that, for such a claim, courts can consider events which on their own would be barred by the statute of limitations, as long as one act that contributes to the hostile work environment claim occurred within the filing period. 536 U.S. at 117. By analogy, Morgan suggests that Sanderson's evidence of factual events that preceded her assignment to Division O are relevant here, not to expand her court claim which was limited to her time at Division O, but rather to support it. See Martinez v. Potter, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (applying Morgan to hold that Title VII plaintiff can use later discrete unexhausted retaliatory acts as background evidence to support exhausted retaliation claim); Sunderman v. Westar

17

Energy Inc., 307 F. App'x 224, 229 (10th Cir. 2009) (unpublished) (holding that district court "should have considered the [discrete, unexhausted acts of] prior retaliation alleged by plaintiff as background evidence when considering plaintiff's claim that he was terminated in retaliation for filing his complaint with the [Kansas Human Rights Commission]")[4]; Thompson v. Tyson Foods, Inc., No. 16-2496-DDC, 2018 WL 705667, at *3 (D. Kan. Feb. 5, 2018) (unreported) (relying on unexhausted later acts of sexual harassment to prove employer failed to respond adequately to earlier complaints of harassment); see also Morgan, 536 U.S. at 113 (stating that Title VII plaintiff can use untimely discrete acts of discrimination as background evidence to support a timely discrimination claim); Pitre v. W. Elec. Co., 843 F.2d 1262, 1267 (10th Cir. 1988) (relying, prior to Morgan, on untimely discrete discriminatory acts to prove employer continued to act with the discriminatory animus required to prove a disparate treatment claim; "Particularly when a company's decision-making process has not changed, evidence of prior discrimination might in some circumstances support the inference that such discrimination continued." (internal quotation marks omitted)").

However, even if we were to consider only the incidents that occurred while Sanderson was a member of Division O, a jury could still reasonably conclude that these incidents by themselves could prove a claim of a sexually hostile work

---

[4] Though unpublished, we find Sunderson's reasoning persuasive.

environment, particularly in light of the evidence that "Division O as a whole does not accept females." See O'Shea, 185 F.3d at 1097.[5]

## 2. Hostile work environment based upon the severe or pervasive nature of the harassment

To show that the harassment was "sufficiently severe or pervasive," Medina, 413 F.3d at 1134, a plaintiff must "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult."[6]  Bird

---

[5] We acknowledge that in the different context of a disparate treatment discrimination claim we generally restrict a plaintiff to evidence of the conduct and motive of those who participated in the adverse employment action against that plaintiff.  See Arambu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997) (Title VII national origin discrimination); see also Roberts v. Int'l Bus. Machines Corp., 733 F.3d 1306, 1310 (10th Cir. 2013) (age discrimination).  However, as we noted in the text, a claim of a sexually hostile work environment is different and often more diffuse, particularly when the plaintiff alleges, as Sanderson does here, that the sexually hostile work environment was not limited to a discrete supervisor.  Instead, she alleges that the hostile work environment included the entire work culture within Division O and was fostered and tolerated throughout Division O and throughout WHP.  Thus, she alleges complicity and responsibility throughout WHP for the sexually hostile environment she experienced while working at Division O.  At trial, Sanderson will have the opportunity to present evidence how this hostile work environment at Division O was formed, who knew about it, and how it was fostered and tolerated.  At least for now, giving all inferences in her favor, she is entitled to proceed to trial on this claim and to reference events before her assignment to Division O as informative of her alleged Division O sexually hostile work environment.

[6] WHP notes that "[A] plaintiff must show that the environment was both objectively and subjectively hostile or abusive."  Morris v. City of Colo. Springs, 666 F.3d 654, 664 (10th Cir. 2012).  "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993)).  WHP argues that Sanderson was not aware of certain acts of discrimination until the discovery phase of this lawsuit.  The district court did not reach a conclusion on that issue.  However, Sanderson presents evidence that she complained to supervisors about her treatment in Division O on at least four occasions.  She also cites a text message that she sent to a supervisor that

19

v. West Valley City, 832 F.3d 1188, 1205 (10th Cir. 2016) (quoting Herrera v. Lufkin

Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007)). "Severity and pervasiveness are

evaluated according to the totality of the circumstances . . . considering such factors

as 'the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" Chavez, 397 F.3d

at 832 (quoting O'Shea, 185 F.3d at 1098). "[T]he severity and pervasiveness

evaluation is particularly unsuited for summary judgment because it is

'quintessentially a question of fact.'" O'Shea, 185 F.3d at 1098.

Still, this court has at times affirmed a ruling at the summary judgment stage

that the plaintiff failed to show harassment that was sufficiently severe or pervasive.

For example, in Morris v. City of Colorado Springs, we considered a hostile work

environment claim from a registered nurse, who alleged that a surgeon twice flicked

her on the head, once threw human tissue at her, and that he generally would "yell at

her [and] demean her work." 666 F.3d 654, 665 (10th Cir. 1999). The evidence in

that case showed that those incidents were "relatively isolated," particularly when

viewed in the context of the plaintiff's "otherwise uneventful tenure" on the team.

Id. at 665, 669. In Sprague v. Thorn Americas, Inc., we considered a hostile work

environment claim from an employee who alleged that a particular supervisor made

---

read: "I have had enough of being treated like shit by my co workers. It's no wonder
no female makes it in the O division. The guys in the division make it down right
miserable for any female." (Aplt. App. 192–93) That is more than enough to satisfy
the subjectivity prong.

five sexually oriented comments, either to her or in her presence, in a sixteen-month period. 129 F.3d 1355, 1365–66 (10th Cir. 1997). There, again, we concluded that, when viewed in the "totality of the circumstances," the five incidents were not sufficient to avoid summary judgment.

We do not view Sanderson's cited acts of harassment as isolated or fleeting. She presents evidence that, before and after her promotion to Division O, she was subjected to persistent, repeated rumors of sexual promiscuity. Those rumors characterized Sanderson as having a sexual relationship with colleagues and various supervisors—"It went from captain to major, or, you know, someone different." (Aplt. App. 312–13) Sanderson's colleagues speculated that she used sex to gain advantages, including securing her position as a K9 handler on Division O. And, those rumors were circulated by multiple colleagues; they were not isolated comments made by a particular supervisor, as in Morris or Sprague. What's more, those incidents were accompanied by facially sex-neutral acts of harassment which the jury could conclude were motivated by, and part of, sexual discrimination against her. A reasonable jury could find that Sanderson has raised genuine issues of material facts as to the severity and pervasiveness prong of her hostile work environment claim. We therefore reverse the district court's summary judgment ruling on Sanderson's hostile work environment claim.

### III.    CONCLUSION

We AFFIRM the district court's dismissal of Sanderson's retaliation claim without prejudice. We AFFIRM the district court's order granting WHP's motion to

21

exclude the testimony of Sanderson's designated expert witness. We REVERSE the district court's ruling concluding that WHP was entitled to summary judgment on Sanderson's hostile work environment claim and we REMAND to the district court for further proceedings.

**HARTZ**, **J**., Circuit Judge, concurring

I concur in the result and all of Judge Ebel's opinion except the portion of the discussion of the hostile-work-environment claim that considers evidence of harassment of Sanderson before she was promoted to Division O. I agree with the opinion that summary judgment was inappropriate on that claim even if one considers only the post-promotion evidence. In particular, because she was the first female assigned to that division, it is reasonable to infer that her being singled out for hostile treatment was based on her sex, although, of course, there may have been other motives.

Where I differ from the opinion is that I do not believe that Sanderson has established the necessary predicate for consideration of the pre-promotion evidence in resolving her claim of post-promotion harassment. It is not enough that she was primed to view various post-promotion hostility as being sex-based because of what she had suffered before. That might be just as true if she had been primed by her experiences in prior private employment. What she must show is that the pre-promotion acts about which she complained were "part of the same actionable hostile work environment practice" as the post-promotion acts. *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016) (internal quotation marks omitted). Relevant (but nonexclusive) factors are whether the pre-promotion and post-promotion acts were "related by type, frequency, and perpetrator," and whether the acts occurred while "the employee was working in the same place." *Id.* (internal quotation marks omitted). In *Hansen* we held that it was proper to consider allegations over a period of eight years of "the same type of sexual

harassment (sexual propositions and unwelcome physical contact)" involving two primary harassers when most of the harassment occurred while the plaintiff was working at the same airport. *Id.* at 924. We distinguished a case in which "the plaintiff alleged she had suffered various types of sexual harassment over twenty years in seven different departments by several different coworkers." *Id.*

Perhaps the necessary connection can be made with respect to the pre-promotion harassment of Sanderson. But I would hold that the connection described at this point does not suffice.