**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 25, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SUSAN PFANNENSTIEL; AMBER
HARRINGTON; NATASHA McCURDY;
KIMBERLY MEADER; JARAH
COOPER,

     Plaintiffs - Appellants,

and

REBECCA CORAZZIN-McMAHAN,

     Plaintiff,

v.

STATE OF KANSAS; HERMAN JONES;
JASON DeVORE,

     Defendants - Appellees,

and

MICHAEL MURPHY; ANDREW DEAN;
ERIC SAUER; WESLEY LUDOLPH;
THOMAS CATANIA,

     Defendants.

No. 23-3145
(D.C. No. 5:21-CV-04006-HLT)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **MURPHY**, and **FEDERICO**, Circuit Judges.
_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

_____

## I. INTRODUCTION

In a single, overarching complaint, Susan Pfannenstiel, Amber Harrington, and Jarah Cooper (referred to collectively as "Appellants") brought, inter alia, Title VII hostile work environment claims against the State of Kansas. In addition, Cooper brought a 42 U.S.C. § 1983 claim against Herman Jones, asserting Jones violated her First Amendment rights.[1] The district court granted summary judgment in favor of Kansas on all Title VII hostile work environment claims and in favor of Jones on Cooper's § 1983 claim. As to the Title VII claims, the district court concluded no Appellant produced sufficient evidence to allow a reasonable jury to find any relevant sex-based discrimination "was sufficiently severe or pervasive such that it altered the terms or conditions of [her] employment." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021). As to Cooper's § 1983 claim, the district court concluded Jones was entitled to qualified immunity because Cooper failed to identify

---

[1] The Second Amended Complaint, the operative complaint for purposes of this appeal, sets out claims for relief on behalf of Natasha McCurdy and Kimberly Meader. McCurdy and Meader are also listed as appellants in the notice of appeal. Appellants' joint opening brief does not, however, address the district court's disposition of any claim raised by McCurdy or Meader. Accordingly, all potential claims of error on behalf of McCurdy and Meader are waived. *See Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020). Similarly, Cooper's § 1983 First Amendment claim, as set out in the Second Amended Complaint, is stated against Jones and Jason De Vore. Furthermore, De Vore is listed as an appellee in the notice of appeal. Appellants' joint opening brief does not, however, address how the district court erred in its disposition of Cooper's § 1983 First Amendment claim against De Vore. Accordingly, Cooper has waived appellate review of the dismissal of her First Amendment claim against De Vore. *Id.*

clearly established law. Appellants appeal, challenging each relevant district court conclusion. We conclude the district court did not err in any aspect of its summary judgment ruling. Thus, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the district court's judgment.

## II. DISCUSSION

**A. Hostile Work Environment Claims**

**1. Legal Background and Standard of Review**

Appellants each asserted a Title VII hostile work environment claim against the State of Kansas.[2] *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456-57 (1976) (holding Congress validly abrogated the Eleventh Amendment sovereign immunity of the States as to suits under Title VII). Title VII "prohibits an employer from discriminating against any individual because of such individual's sex. Under Title VII, a plaintiff can prove discrimination in several different ways, including proof of a hostile work environment." *Throupe*, 988 F.3d at 1251 (quotation, citation, and alteration omitted). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id.* (quotation omitted). For Appellants to state a valid Title VII hostile work environment claim, they must present sufficient evidence sex was a motivating factor in discrimination against them. *Id.* They must also "offer evidence that the

---

[2] Pfannenstiel's Title VII hostile work environment claim is set out in Count 6 of the Second Amended Complaint, Harrington's is set out in Count 13, and Cooper's is set out in Count 30.

defendant's conduct was so severe or pervasive as to alter the terms or conditions of employment. Proof of either severity or pervasiveness can serve as an independent ground to sustain a hostile work environment claim." *Id.* at 1252. This determination involves an examination of the "totality of the circumstances" and a consideration of "such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotations omitted). This element is assessed both objectively and subjectively. *Id.* "It is not enough that the plaintiff perceived the conduct to be severe or pervasive. Rather, the plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Id.* (quotation omitted). "[T]he run-of-the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Id.* (quotation omitted). Likewise, "a few isolated incidents of discriminatory conduct does not make the harassment pervasive." *Id.* (quotation omitted). "[W]hether the conduct was severe or pervasive is typically a question for the jury," but this court "can affirm a district court's grant of summary judgment when the plaintiff fails to make this showing." *Id.*

This court reviews the grant of summary judgment de novo applying the standard set out in Fed. R. Civ. P. 56. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Summary judgment is proper if the movant demonstrates "there is no genuine dispute as to any material fact" and it "is entitled to judgment as a

4

matter of law." Fed. R. Civ. P. 56(a). In applying this standard "we view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Adler*, 144 F.3d at 670. A dispute is "'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* "If there is no genuine issue of material fact, we next determine whether the district court correctly applied the substantive law." *Id*. "[A]lthough our review is de novo, we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Id.* at 671; *see also* Fed. R. Civ. P. 56(c)(1).

### 2. Analysis

#### a. Pfannenstiel

Pfannenstiel began working for Kansas in 1999. She originally worked in the Kansas Department of Administration ("DOA"), but eventually transferred to the Kansas Highway Patrol's ("KHP") Human Resources ("HR") Department. She was promoted to Director of HR at KHP, a position she held for the three years before she retired on September 1, 2020. As KHP's Director of HR, Pfannenstiel reported to Major Scott Harrington[3] at KHP and Craig Kibbe, DOA's Deputy Director. Kraig Knowlton, Director of the Office of Personnel Services ("OPS"), was Kibbe's

---

[3] Appellant Harrington and Scott Harrington are siblings. To avoid confusion, this court refers to appellant Harrington by her last name and refers to Scott Harrington by his full name.

supervisor. During the time relevant to Pfannenstiel's hostile work environment claim, Jones was the head of the KHP and De Vore was his deputy.[4]

In support of her hostile work environment claim, Pfannenstiel identifies five categories of acts supporting the existence of severe or pervasive sex-based harassment. The first category involves the following instant message exchange between Jones, the head of KHP, and Pfannenstiel in October of 2019:

> [10/10/2019 4:13 PM] [Jones] Getting our money's worth from you this week huh!
>
> [10/10/2019 4:13 PM] [Pfannenstiel] what an understatement (facepalm emoji) It's all good (thumbs up emoji)
>
> [Jones] Well at least I know you're not sleeping on the company's couch. (smiley with tongue hanging out emoji)
>
> [Pfannenstiel] WE have a couch? Wait…no one told me
>
> [10/10/2019 4:17 PM] [Jones] See, you've been soooooo busy, you didn't even notice the beige couch in the corner. Since you're not using it I'm going to have it removed and place[d] elsewhere. (mmm emoji)
>
> [10/10/2019 4:18 PM] [Pfannenstiel] I see, ok fine (sleep emoji)
>
> [10/11/2019 8:25 AM] [Jones] And you came back?!
>
> [10/11/2019 8:25 AM] [Pfannenstiel] Yes sir
>
> [10/11/2019 8:27 AM] [Jones] I guess you don't need that couch after all huh!
>
> [10/11/2019 8:27 AM] [Pfannenstiel] I guess not

---

[4] The same is true for the time periods embraced by Harrington's and Cooper's claims.

> [10/11/2019 8:39 AM] [Jones] Have a great day and thank you for all that you do to advance the agency and Kansas. (thumbs up emoji)
>
> [10/11/2019 8:40 AM] [Pfannenstiel] I am dedicated to the KHP and OPS as well. Have a nice day.
>
> [10/11/2019 8:40 AM] [Jones] Yelp ma'am!

Pfannenstiel testified this exchange made her feel "very uncomfortable." She felt Jones's references to the couch were offensive or suggestive: "Because how does a couch even come… into play, and … combine that with the tongue hanging out emoji, that immediately, I don't know what you want to call it,… it alerted me." Pfannenstiel advised Scott Harrington about the exchange and read the messages to him. Scott Harrington testified Pfannenstiel was "visibly shaken" by the messages and "it was unlike anything [he] had seen from [her] before." Scott Harrington further testified he thought the messages were sexual in nature because of the references to the couch.

On December 3, 2019, Pfannenstiel had what she perceived to be a very uncomfortable encounter with Major Mike Murphy. In notes to herself documenting the encounter, Pfannenstiel described the incident as follows:

> Major Mike Murphy came into my office to pick up a file. He closed the door so we could discuss [an]… employee situation. . . .
>
> [Murphy] was attempting to demonstrate the way the female employee approached him the first time they met. I was seated behind my desk with my hands in my lap. He came around the desk, got real closed to my face (no more than 5 inches from me) and reached for my hand. He stated, "she said well hi, Major." I immediately pushed back from him and made distance with the length of my arm while stating, "whoa you're in my personal space." He laughed and took a seat across the

desk from me. He stated "do you see what I mean? She made me feel uncomfortable. I couldn't even look at her in the face."

I was very uncomfortable particularly since we were behind closed doors.

By February of 2020, Jones and De Vore knew unidentified individuals were being critical of Jones and his leadership team. On February 10 or 11, 2020, Pfannenstiel was summoned to a meeting with Jones and De Vore about an anonymous letter highly critical of Jones that was sent to the Governor. The letter accused Pfannenstiel of not doing her job by allowing misconduct to occur and not reporting it. Jones and De Vore said the letter "had [Pfannenstiel's] name all over it" when it accused her of shirking her job duties. According to Pfannenstiel, Jones said "if he found out who wrote the [anonymous letter to the governor] or who had anything to do with this information, he would see that they have a parting of the ways with this agency." Jones's posture was very threatening and both he and De Vore were in uniform with weapons showing. De Vore said Pfannenstiel should watch what she says in the future because people were being critical of her. Pfannenstiel reported this meeting to Knowlton and Kibbe. Knowlton responded by noting "[t]his is the first I am hearing of this. I will see what I can find out from the Governor's Office, but rest assured that we have your back over here so please don't stress about this too much." He further noted that, given the surrounding circumstances "even though the format and tone were far less than ideal, I think the message to be careful what you say to whom is good advice."

8

In entirely generalized fashion, Pfannenstiel asserts that beginning in March of 2020, Jones and De Vore left her out of conversations and policy change decisions which required involvement of the HR Director, such as making changes to the interview and selection process, as well as changes to policies relating to retirement or resignation. In similarly generalized fashion she asserts that, during staff meetings, her statements, recommendations, and input were discounted in front of the rest of the management staff. Pfannenstiel testified these actions interfered with the performance of her duties as the HR Director, explaining "[i]t became impossible for me to direct my staff appropriately when those legitimate policies and regulations were being usurped at every turn."[5]

---

[5] Pfannenstiel's reliance on these generalized assertions of retaliatory conduct is not weighty. First, in the district court, Pfannenstiel brought a retaliation claim premised on this exact alleged conduct on the part of Jones. She asserted that in retaliation for her participation in a DOA investigation of Jones, "she was excluded from policy and procedure discussions and [had] her suggestions and input ignored." The district court recognized the generalized nature of the retaliation claim and the absence of specific factual bases. At best, Pfannenstiel identified two specific emails reflecting policy disagreements with Jones. Notably, Knowlton, Pfannenstiel's ultimate supervisor, averred, without direct or specific contradiction, that HR managers at agencies like KHP are merely advisors that should simply "advise and abide by the decisions of those who are authorized to make the decisions." He further attested "it is not unusual or surprising that decisionmakers in an agency will make decisions that are not exactly in line with HR recommendations" and that such situations do "not in any way reflect negatively on the HR manager or impact his or her career opportunities." Finally, Knowlton noted he examined the only two specific actions identified by Pfannenstiel as retaliatory and concluded it was his "opinion that there is not anything out of the ordinary in the interactions between agency leadership and the HR manager described there."

More importantly, the district court engaged in a lengthy analysis and concluded no reasonable juror could find that Jones was aware Pfannenstiel participated in the DOA investigation. On appeal, Pfannenstiel has simply

The final category involves Pfannenstiel's alleged awareness of a "sexually hostile culture" at KHP, specifically noting her awareness of Jones's harassing actions toward Meader and Harrington.

The district court granted summary judgment in Kansas's favor, concluding Pfannenstiel failed to demonstrate acts of harassment that were sufficiently severe or pervasive so as to alter the terms and conditions of her employment.[6] Referencing its decision at the motion-to-dismiss stage, the district court concluded nothing in the instant message exchange could be considered objectively severe harassment. According to the district court, the conversation included some brief banter about sleeping on an office couch due to long working hours. Both Pfannenstiel and Jones appeared to be joking and both used emojis that reflect a joking tone. The second half of the instant message interaction was mostly just Jones thanking Pfannenstiel for her work. As to the meeting with Jones and De Vore about the anonymous letter to the government, the district court noted it was not physical. Although Jones and De Vore were armed and in uniform, the district court recognized such a state was not unusual

repackaged aspects of her now-defunct retaliation claim as part of her hostile work environment claim. She has done so, however, without addressing this critical aspect of the district court order. That is, in the district court, Pfannenstiel argued the reason Jones undertook these actions was to punish her for reporting to DOA Jones's harassment. She then simply included the alleged act of retaliation as part of her hostile work environment claim. She does not explain on appeal how the alleged retaliatory acts could continue to support the existence of a hostile work environment given the unchallenged district court decision that no retaliation could have taken place because Jones was not aware of her actions.

[6] The district court assumed, without deciding, that a reasonable juror could find some of the conduct alleged was sex-based.

at the KHP. The district court noted the only incident involving a physical aspect, the interaction with Murphy, involved Murphy explaining to HR actions of a third employee that made Murphy uncomfortable. Finally, the district court concluded all incidents considered in the aggregate could not be considered pervasive. The district court ruled the exceedingly limited evidence Pfannenstiel submitted as to Jones's allegedly harassing conduct towards other women did not alter that conclusion.

Like the district court, this court concludes it is unnecessary to resolve whether Pfannenstiel came forward with sufficient evidence for a jury to find the conduct directed at her was sex-based. Instead, upon de novo review, we affirm the district court's ruling that no jury could find the alleged conduct, considered in its totality and the context of surrounding circumstances, was sufficiently severe or pervasive that it altered the terms or conditions of Pfannenstiel's employment.

Because it includes the only alleged conduct directed at Pfannenstiel involving anything approaching a physical element (i.e., the brief attempt to grab her hands while invading her space), this court begins with the incident involving Murphy.[7] The record reveals Pfannenstiel's interaction with Murphy took place entirely in the context of Pfannenstiel's role as the HR Manager tasked with reporting and

---

[7] As set out below in discussing Harrington's hostile work environment claim, this court does "not simply . . . accept [Pfannenstiel's] claim that all the discriminatory conduct [she] identifies was part of the same hostile work environment." *Throupe*, 988 F.3d at 1255 n.3; *see also infra* at 19-21. Even if this court considers the Murphy incident as part of a single unified hostile work environment, Pfannenstiel's Title VII claim fails and, therefore, we need not consider the matter further.

investigating employment issues. There is no evidence in the record indicating the interaction was anything other than an isolated event. Murphy attempted to touch Pfannenstiel's hands while explaining the nature of his interactions with a different KHP employee. When Pfannenstiel objected, Murphy stepped back and sat down on the other side of Pfannenstiel's desk. Viewed objectively, Murphy's conduct does not satisfy the high bar required to meet Title VII's severe-or-pervasive standard. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 485 (6th Cir. 2020) ("Alleged harassment in the context of a hostile-work environment-claim must be sufficiently 'pervasive' or 'severe' to alter the conditions of employment. This standard sets a high bar for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect." (citation omitted)). The same is true as to the meeting involving Jones, De Vore, and Pfannenstiel about the anonymous letter to the governor. Although the meeting was clearly tense, it was not physical. Pfannenstiel emphasizes that Jones and De Vore were in uniform and were armed. Those facts, however, must be considered in the context of the relevant surrounding circumstances. As noted by the district court, it was not unusual for KHP employees to be armed and in uniform. *See Morris v. City of Colo. Springs*, 666 F.3d 654, 668 (10th Cir. 2012) (considering analogous contextual circumstances in the medical employment context).

Nor could a reasonable jury find, based on the evidence Pfannenstiel presented to the district court, that she was subject to pervasive harassment. The anonymous-letter and Murphy incidents were isolated and unrelated. Pfannenstiel attempts to

cobble them together by asserting (1) Jones ignored her input on HR matters and (2) there existed in KHP a pervasive atmosphere of sex-based harassment. Neither assertion carries the weight Pfannenstiel attempts to place upon it. As noted above, *supra* n.5, the evidence Pfannenstiel identified in support of the assertion Jones retaliated against her by ignoring her input on HR matters is narrowly limited to two specific instances. These two instances are not a pattern. And, in any event, Pfannenstiel's conclusory testimony must be considered alongside Knowlton's specific and detailed testimony to the contrary. Although this court must credit Pfannenstiel's testimony at the summary judgment stage of proceedings, that testimony demonstrates only that she believed Jones was acting contrary to some unidentified policy or directive. Pfannenstiel presented no objective evidence— comparative actions of other agency heads or HR managers, written policy, etc.—that Jones wrongly ignored her input on HR matters. *See In re Grandote Country Club Co.*, 252 F.3d 1146, 1149-50 (10th Cir. 2001) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact. . . . To withstand summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." (citations and internal quotation marks omitted)). In any event, even assuming Jones did make a sex-based decision to disregard Pfannenstiel's input on these two matters, his actions are not pervasive. Nor do those actions render the anonymous-letter and Murphy incidents pervasive.

Pfannenstiel's reference to an overarching atmosphere of sexual harassment suffers from a similar evidentiary failing. As noted by the district court, the only

13

evidentiary support for this assertion, at least the only evidence included in the summary judgment record and brought to the district court's attention, is the fact Pfannenstiel, Harrington, Meader, and McCurdy were interviewed together for an August 2020 television story.[8] No Appellant, however, included any facts in the summary judgment record as to the contents of that interview. Likewise, Pfannenstiel did not allege any discrete acts of harassment directed at her during the roughly two-week interval between the interview and her retirement.

On the record presented to the district court, the district court correctly concluded no reasonable juror could find the alleged acts of harassment directed at Pfannenstiel were sufficiently severe or pervasive that they altered the terms or conditions of her employment.

### b. Harrington

Harrington started working as a KHP trooper in 2000. She was promoted to Captain in 2017, a position she maintains to this day. Harrington's hostile work environment claim is composed of two component time periods. The first component relates to her direct interactions with Jones in late 2019. The second component relates to alleged acts of retaliation that occurred in 2020 to 2021.

---

[8] To the extent Pfannenstiel has combed the summary judgment record in an effort to present to this court additional evidentiary support not presented to the district court for the assertion she knew about Jones's mistreatment of Harrington and Meader prior to this interview, we decline to consider the matter. As noted above, this court reviews the correctness of the district court's grant of summary judgment based on the arguments made to and materials presented to the district court. *Adler*, 144 F.3d at 670; Fed. R. Civ. P. 56(c)(1).

In August 2019, Harrington attended a meeting with Jones and De Vore. Jones touched or "smacked" Harrington on the back of her shoulder. Harrington told Jones his conduct "was highly inappropriate." In response, Jones touched her again and said "there, I take it back." On October 31, 2019, Jones "was going down a row of chairs [at a training session], shaking the hand of everyone present." Jones was "talking to the back row"; Harrington felt Jones's body "near the back of her chair" as he talked to the people behind her. Jones then turned around directly behind Harrington and "placed his hand on [her] shoulders and start[ed] patting them." Jones brushed "up against [her] arm to reach in and shake [her] hand." According to Harrington, as Jones reached for her hand, he "purposely glided his hand across [her] left arm nice and slow." Jones shook hands with everyone in the room. Finally, on December 27, 2019, Harrington was presenting plaques at a retirement ceremony. Although she did not realize it at the time, another KHP employee said he saw Jones put his hands on Harrington's shoulders as she was unwrapping plaques. Jones has not touched Harrington since the plaque incident. Jones's executive assistant testified she never saw Jones touch any male employee the way he touched Harrington. Jones has never made a suggestive or offensive comment to Harrington and she has not seen him touch other women.

Harrington filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 8, 2020. She alleged undescribed acts of "sexual harassment/gender discrimination" occurring on the following dates in 2019: August 1, September 10, October 2, October 14, October 31, and December

27. The charge also asserted that based on her act of reporting discrimination and harassment directed at both her and other female KHP employees, she experienced multiple acts of undescribed, ongoing retaliation.

In her brief on appeal, Harrington describes the acts of retaliation, beginning with the appointment of Major Andrew Dean as her direct supervisor. In July 2020, Major Josh Kellerman was terminated from his employment by the KHP. Prior to his termination, Kellerman was Harrington's direct supervisor. In August 2020, Dean became Harrington's direct supervisor. Several weeks later, on September 8, Harrington filed her EEOC complaint. On September 16, Harrington sent an email to Dean protesting his directive that she prepare a schedule for a full contingent of officers who would be in the Kansas State Capitol for the 2021 Legislative session "at all times and absolutely no overtime accrued." Harrington's email set forth the reasons she believed "it is impossible to fill in the gaps with Troop K's current manpower." She concluded by asserting Dean was "setting [her] up for failure" and that she believed his actions in that regard were "directly connected" to her EEOC charge. It is uncontested Dean became aware of Harrington's EEOC complaint "right around [the] same time" as her email to him on September 16.

In late January of 2021, Dean received text messages from Lieutenant Crystal Golightley. In those messages, Golightley expressed concerns about working underneath Harrington and indicated there existed a hostile work environment. A few days later, Dean and a KHP legal counsel met with Golightley at a coffee shop. Golightley told Dean that Harrington created a hostile work environment. Golightley

16

did not, however, fill out a written complaint form. In February of 2021, Lieutenant Dan Diloreto was asked to investigate Golightley's complaint against Harrington. Diloreto worked in KHP's Professional Standards Unit ("PSU"). It is uncontested that Jones ordered all PSU investigations. According to Diloreto, "[d]ue to the sensitive nature of the allegations in the case," the PSU requested permission from Jones to initially suspend notifying Harrington of the investigation. Jones approved PSU's request.

On March 9, 2021, Jones placed Harrington on administrative leave with pay, relieving her from duty pending the PSU investigation. As a result, Harrington's patrol car and office keys were taken from her, and her access to KHP's network and email were suspended. On April 24, 2021, Harrington received a letter from KHP advising her that Golightley's harassment complaint was not substantiated by the PSU investigation, but a charge of insubordination was sustained through factual evidence. According to Diloreto, the factual evidence which sustained the charge of insubordination primarily consisted of Harrington's own statements to the PSU during an interview. During her deposition, Harrington testified she was not insubordinate and did not make negative comments about Jones.

Harrington was not returned to work until June 14, 2021, almost two months after the investigation was completed. That day, Harrington was given an unsatisfactory performance review by Dean. In this review, Dean enumerated Harrington's "[f]ailure to follow instructions," her "failure to follow [the] chain of command," and the results of the PSU investigation. Also on June 14, 2021, Dean

17

placed Harrington on a special performance review for 150 days, due to the unsatisfactory rating for her annual performance review. On November 10, 2021, Harrington successfully completed her special review period.

The district court granted summary judgment in Kansas's favor. It first expressed significant doubt as to whether Harrington produced sufficient evidence for a jury to find any harassment was sex-based. The district court noted that "Harrington acknowledges being touched on other occasions by Jones, and though apparently unwelcome, she does not consider them as sexually motivated." The district court concluded that even if it assumed a jury could find sex-based harassment, Kansas was still entitled to summary judgment. That was because, according to the district court, Harrington failed to adduce evidence from which a reasonable juror could find that the retaliatory acts by Dean were properly considered as part of a single hostile work environment claim. The district court noted the alleged acts of touching and alleged acts of retaliation occurred in different timeframes and involved different perpetrators. *See Throupe*, 988 F.3d at 1255 n.3. The district court ruled no reasonable jury could find the three acts of touching by Jones amounted to severe or pervasive harassment. When the alleged retaliatory acts were appropriately decoupled from the touching incidents, no reasonable jury could find the alleged acts of retaliation were sex-based.

Upon de novo review, this court affirms. In so doing, we have little to add to the district court's astute analysis. Like the district court, we easily conclude no reasonable juror could find that the three alleged acts of inappropriate touching by

18

Jones, standing alone, constitute the type of severe or pervasive harassment that amounts to a Title VII hostile work environment. In her brief on appeal, Harrington does not directly argue to the contrary. Instead, she appears to argue that Dean, in undertaking his acts of retaliation, was acting as Jones's cat's paw. As set out at length in Kansas's response brief, however, Harrington's argument in this regard is based entirely on supposition and conjecture. For instance, Harrington asserts a jury could find that Dean convinced Golightley to complain about Harrington's supervisory conduct. The only record evidence is to the contrary, with both Dean and Golightley swearing the decision to complain was made entirely by Golightley without input from any command staff. The only response to this evidence in the record is Harrington's contention that the jury could simply choose to disbelieve Dean and Golightley. As the Supreme Court made clear four decades ago in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986), when a nonmovant like Harrington carries the burden of proof, she cannot avoid summary judgment without coming forward with affirmative evidence. The mere assertion a jury might disbelieve Dean or Golightley is simply not enough. *Id.* In the end, having combed through the record, this court cannot find remotely sufficient evidence for a jury to find that Jones used Dean to retaliate against Harrington, rendering Jones's actions and Dean's actions a unified hostile work environment claim. Instead, the record reveals Golightley herself came forward with the complaint that initiated the investigation; Diloreto conducted the investigation consistent with written KHP/PSU policy; and Jones was involved only in a limited fashion when he was requested to

19

take a specific action by PSU. Harrington's mere assertions the jury could disbelieve this evidence is not enough to create a fact question for the jury. *Id.*

Consistent with the district court, we hold as follows: (1) assuming they are sex based, the three incidents in which Jones touched Harrington in 2019 are not severe or pervasive and, thus, did not alter the terms and conditions of Harrington's employment; (2) no reasonable jury could find Jones's actions and Dean's actions amount to a single hostile work environment under the standard set out in *Throupe*, 988 F.3d at 1255 n.3.; and (3) Harrington does not argue, let alone point to record evidence from which a reasonable jury could find, Dean's allegedly retaliatory actions were sex-based. Thus, the district court correctly granted summary judgment in Kansas's favor on Harrington's Title VII hostile work environment claim.

### c. Cooper

Cooper began working for KHP as a Trooper in 2017. At the time, she was assigned to Troop A in Kansas City, Kansas. In April 2020, Cooper began dating another trooper, Lucas Bryon. In October 2020, she learned she was pregnant. That same month, Cooper requested a hardship transfer to Troop C in Riley County, Kansas.; KHP granted this request. KHP also granted Cooper's request for limited-duty assignment due to her pregnancy. After Cooper transferred to Troop C, both she and Bryon were directly supervised by Lieutenant Scott Proffitt. Proffitt's supervisor was Captain Bruce Hyman. On December 17, 2020, Cooper sent a letter to Jones, resigning from her employment with KHP. Cooper made no complaints about an

20

alleged hostile work environment while she was employed with Troop C. During that time, no one threatened to fire Cooper and no one yelled at her.

Cooper claims she was subjected to a hostile work environment between October 20 and November 30, 2020. According to her brief on appeal, her claim is based on four categories of hostile acts directed toward her by Proffitt and Hyman. The first category consisted of imposing upon Cooper work restrictions which were beyond what her physician ordered. Initially, Cooper's physician ordered the following pregnancy-related work restrictions: driving only one hour per shift; no climbing; light or desk duty; and only lifting 20-40 pounds one or two times per shift. According to Cooper, however, when Proffitt met with her on October 21, 2020, he told her that she was not to have any direct contact with the public.[9]

---

[9] The record identified by Cooper in support of this assertion is her deposition, which reads as follows:

> Cooper: [Proffitt] told me that he had originally talked to [Hyman] about what my limited duty assignment would be. And they discussed having me check VIN numbers for the—they get numerous calls for troopers to go check the VINs around—usually it's done at the person's residence or it could be done at wherever location.
>
> And they discussed having me do that, because they get a lot of calls for that. And [Proffitt] told me that [Hyman] said he didn't want me to have direct personal contact with the public.
>
> Counsel: Because of COVID?
>
> Cooper: I don't recall.
>
> Counsel: So you don't know if [your physician] provided you any thoughts on how to protect yourself as a pregnant person and COVID pandemics?
>
> Cooper: I don't remember it being a primary concern.

21

The second category consisted of the close monitoring of Cooper by Proffitt. In her answer to interrogatories, Cooper asserted as follows:

> [Proffitt] would physically drive to her station to ensure she was working and drive to her home to see why [she] was not at the station. He would consistently check her whereabouts and follow[] up on [her] assignments. Others in limited duty assignments did not receive the same treatment as [her] nor did [Proffitt] consistently check other troopers' whereabouts.

The third category consisted of refusing to allow Cooper to attend a four-day training class on human trafficking in November of 2020. Prior to her transfer to Troop C, Cooper was granted approval to attend the training. On October 21, 2020, Cooper requested approval from Troop C to attend the training. Proffitt told Cooper that Hyman refused to approve her request due to the one-hour driving restriction imposed by her physician. October 28, 2020, Cooper received a revised limited-duty restriction from her physician allowing her to drive up to three hours per shift. Proffitt again refused to authorize her to attend the training.

The fourth category consisted of what Cooper describes as Proffitt "spying" on her apartment on November 19, 2020. In her deposition, Cooper described this incident, which occurred at 7:15 am, as follows: "My husband caught him across the street at a gas station spying on our apartment. My husband told me that he had

---

Counsel: But you don't know what you discussed with [your physician]; correct?

Cooper: I don't recall.

binoculars in his hands, and he started to wrap them up because my husband approached him and they had a conversation."[10]

The district court granted summary judgment in Kansas's favor, concluding Cooper had not raised a genuine fact about either element of her hostile work environment claim. First, the district court concluded Cooper failed to produce sufficient evidence from which a jury could find her alleged mistreatment was based on sex:

> Although Cooper complains she was the only female trooper in Troop C, this doesn't demonstrate that any of the allegedly harassing actions she complains about were done because of her sex. Although facially neutral harassment may be considered when joined with sex-based harassment, [*Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1174-75 (10th Cir. 2020)], here, Cooper has nothing of the latter. . . . [A]lthough she complains that she was treated differently than similarly situated men, she has failed to point to any such facts that would support such a conclusion. Nor is any of the conduct sexual in nature.

---

[10] In support of the notion Proffitt's actions in this regard were unusual, Cooper notes that Jones testified he was not aware of any supervisor who had ever "staked out" an employee's residence. Nor was he aware of any employee who had their residences "staked out." Cooper does not explain how Jones's lack of information creates a fact issue as to this matter given other evidence in the record. Proffitt testified he drives past "all [his] people's residence hopefully once or twice a year" for emergency response purposes. Proffitt had been to Byron's residence before Cooper moved there. The first time Proffitt drove past Byron's and Cooper's residence was when Cooper was supposed to be, but was not, at work. Proffitt drove by the residence because he could not find Cooper. Once Proffitt was not at the residence but was, instead, parked a few blocks away. Proffitt was seeing if Byron was timely going where he was assigned to work because Proffitt had an issue with Byron not reporting to his location. Previously, Proffitt drove past an unrelated male trooper's house twice because the trooper was not replying to the radio and was suspected of sitting at home during his shift. Cooper admitted she did not know why Proffitt drove past her residence.

23

The district court further concluded that even if Cooper had created a genuine issue as to whether the harassment she suffered was sex-based, the harassment was not objectively severe or pervasive. In so concluding, the district court noted Cooper failed to identify any conduct that was physically threatening or humiliating. *See Throupe*, 988 F.3d at 1252. Nor had Cooper identified any offensive comments made to her or within her knowledge. Finally, the district court ruled that as to some aspects of the alleged harassment—allegations Proffitt followed up on her work assignments and made sure she completed her assigned tasks—no reasonable jury could find the actions amounted to harassment.

Upon de novo review, this court concludes the district court did not err in granting summary judgment to Kansas on Cooper's Title VII hostile work environment claim. Cooper failed to come forward with evidence her alleged mistreatment was sex-based. In a three-sentence paragraph, Cooper asserts she has satisfied her burden because (1) she was the only woman in Troop C and (2) she was denied permission to attend the training session because of the initial pregnancy-related work restrictions imposed by her physician. But Cooper fails to explain how these two facts bear on whether her alleged harassment was sex-based. Indeed, Cooper does not identify any part of the record that would support a specific finding of differential treatment. At base, Cooper is asserting her status as a woman is enough to show sex-based harassment. This assertion is obviously at odds with the governing law. *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) ("[S]imply being the lone member of [a class protected by Title VII] within a

24

supervisor's chain of command, without more, does not demonstrate [sex-based] animus."). And, as to the training seminar, Cooper does not say how complying with an established work restriction imposed by her physician amounts to sex-based mistreatment. Nor does she explain how a refusal to disregard such an established limitation that benefitted her, in favor of a late blooming lesser restriction designed to allow her to undertake training she specifically desired, is sex-based harassment.

Furthermore, the district court correctly concluded the alleged acts of harassment, considered in context and totality, were insufficiently pervasive or severe to change the terms or conditions of Cooper's employment. At most, viewed entirely in Cooper's favor, the facts reveal an overzealous management style on the part of Proffitt, a management style directed at male and female troopers alike. Cooper does not identify a single case with remotely analogous facts, from this court or any other, holding that similar conduct is objectively severe or pervasive enough to create a fact question for the jury on Title VII liability. She does not point to evidence of physical intimidation or name-calling. Nor does she point to any concrete interference with her ability to conduct her job duties. Her complaint boils down to a simple assertion it was not pleasant to work under Proffitt's supervision. As this court has made clear, however, "run-of-the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Throupe*, 988 F.3d at 1252 (quotation omitted).

**B. First Amendment Claim**[11]

**1. Factual and Procedural Background**

The background facts adduced by Cooper in support of her First Amendment claim are extraordinarily limited. At the end of the summer of 2020, Cooper drafted a letter to the Governor of Kansas. The letter complained (1) KHP did not allow mourning bands to be worn on troopers' uniforms for as long as Cooper hoped to honor a trooper friend of hers who committed suicide, (2) troopers were not initially allowed to make a "last call" on the radio for the deceased trooper, (3) a debrief about the suicide was not as prompt as Cooper hoped, and (4) Jones and De Vore "completely revamped the structure and placement of people within [KHP]." In addition, the draft letter stated, in a single paragraph, the following:

> I have already seen the way they treat females in a world that's supposed to be equal. My mentors and friends have been disrespected by sexism and sexual harassment. My peers and immediate supervisors have given me every opportunity my male counterparts receive, but what value does that hold if the leaders at the top profoundly disrespect women? I am fairly new to the [KHP]; and, seeing the proof I have of their disrespecting women absolutely makes me disgusted.

Cooper did not send her draft letter to the Governor because she feared being fired. Cooper averred that Jones used a canoe analogy: "if you're not in my canoe then basically you're out of the loop, you're out of the club." She testified generally that Jones used this language to threaten the jobs of noncooperating KHP employees.

---

[11] Cooper's First Amendment claim is set out in count 28 of the Second Amended Complaint.

Jones moved for summary judgment on Cooper's § 1983 First Amendment claim. He argued he was entitled to qualified immunity because Cooper failed to demonstrate a violation of her clearly established First Amendment right to speech. In her response in opposition to Jones's request for summary judgment, Cooper did not even mention qualified immunity. Instead, after briefly setting out the legal standard applicable to such a claim, Cooper's response in opposition focused exclusively on three issues relating to whether her speech involved matters of public concern. The district court granted summary judgment in Jones's favor, ruling as follows: "[Cooper does] not respond to the assertion of qualified immunity by Jones . . . at all. Although [she] respond[s] to some of the substantive arguments . . . , [she failed] to identify any clearly established law that aligns with the facts of this case . . . ."

**2. Legal Background and Standard of Review**

"[A] state cannot condition public employment on a basis that infringes [an] employee's constitutionally protected interest in freedom of expression." *Arndt v. Koby*, 309 F.3d 1247, 1251 (10th Cir. 2002) (quotation omitted). The First Amendment "does not apply with full force," however, in the context of government employees. *Id.* (quotation omitted). "If the government restrains the free speech rights of its employees, we assess the validity of that restraint by balancing the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quotation and alteration omitted).

27

This court assesses the constitutionality of speech restrictions under the "so-called *Garcetti/Pickering* test." *Avant v. Doke*, 104 F.4th 203, 208 (10th Cir. 2024); *see also Arndt*, 309 F.3d at 1251 (holding this test applies in both the retaliation and prior restraint contexts). The first three parts of the test, all legal questions, are as follows: (1) whether the employee's speech relates to the employee's official duties; (2) whether the speech involves a matter of public, as opposed to private, concern; and (3) whether the government's interest in the efficiency of the public services it performs through its employees outweighs the employee's interest in free speech. *Avant*, 104 F.4th at 208 & n.3; *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996). The last two parts of the test, relating to the fact issue of causation, query whether (4) an adverse action was at least partially caused by the employee's speech; and (5) the employee would not have been otherwise fired in the absence of the protected speech. *Id*.[12]

State actors sued in their individual capacities under § 1983 may assert qualified immunity. *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016). As noted above, Jones specifically made such an assertion in his request for summary

---

[12] Although *Arndt* holds that this court assesses prior restraint cases under the *Garcetti/Pickering* test, no decision of this court considers how the causation portions of the test should apply in such cases. Instead, our cases have been resolved in government employer's favor at the public concern and balancing parts of the test. *Arndt*, 309 F.3d at 1252-53; *Belcher v. City of McAlester*, 324 F.3d 1203, 1208-09 (10th Cir. 2003). Given Cooper's failure to address the issue of qualified immunity in her brief in opposition to summary judgment, this court need not consider the matter further.

judgment. The "assertion of qualified immunity creates a presumption [Jones is] immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). Thus, the burden shifted to Cooper to show Jones violated a constitutional right that was clearly established at the time of his conduct. *Gutierrez,* 841 F.3d at 900; *see also Avant*, 104 F.4th at 207-08. In contrast to "most affirmative defenses, the plaintiff bear[s] the ultimate burden of persuasion to overcome qualified immunity." *Gutierrez*, 841 F.3d at 900 (quotation and citation omitted). If, and only if, a plaintiff meets this burden, does the traditional summary-judgment burden shift back to the defendant to show there is no genuine issue of material fact for trial. *Rojas v. Anderson*, 727 F.3d 1000, 1004-05 (10th Cir. 2013).

This court reviews all aspects of the district court's decision—the grant of summary judgment, the applicability of qualified immunity, and First Amendment questions—de novo. *Avant*, 104 F.4th at 207; *Arndt*, 309 F.3d at 1250-51.

### 3. Analysis

Cooper asserts the district court erred in concluding she failed to carry her initial burden of demonstrating the existence of a clearly established violation of her First Amendment rights. In so arguing, she notes she cited to this court's decision in *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir. 1989). She further asserts *Wulf* clearly establishes that reports of sexual harassment involve matters of public concern. *See id.* at 859-60.

The problems with Cooper's assertions in this regard are numerous. It is enough, however, to note that *Wulf* discusses only a single aspect of the

29

*Garcetti/Pickering* test—whether the speech at issue there related to a matter of public concern. *Id.* Our precedent obligates Cooper, however, to come forward with sufficient evidence which, if believed by a jury, demonstrates the existence of a clearly established violation of her First Amendment rights. *Gutierrez,* 841 F.3d at 900. Even setting aside issues of causation, Cooper was obligated to demonstrate (1) the existence of a speech restriction, (2) relating to matters outside her official duties, (3) that prevented her from speaking on a matter of public concern, and (4) her interest in speaking outweighed KHP's interest in the efficient provision of public services. *Avant,* 104 F.4th at 208 & n.3; *Gardetto,* 100 F.3d at 811. Because Cooper did not carry her burden of persuasion by establishing the existence of a clearly established violation of her speech rights, the ultimate burden never shifted to Jones, entitling Jones to qualified immunity. *Rojas,* 727 F.3d at 1004-05.

Even setting this failure aside and focusing solely on *Wulf*, as Cooper suggests, would not result in a different outcome. *Wulf* involved a discrete act of reasonably perceived sexual harassment of a subordinate by an identified supervisory police officer. 883 F.2d at 860. Cooper's proposed speech references a generalized atmosphere of sexism and sexual harassment. In *Wulf*, every aspect of the plaintiff's letter, in addition to the discrete allegation of sexual harassment, addressed a matter of public concern. *Id.* Cooper's draft letter to the Governor addresses multiple additional topics, none of which she asserts are matters of public concern. It is certainly true that, at least as to the matter of content, only a portion of the communication need address a matter of public concern. *Id.* Nevertheless, embedding

a matter of public concern in a much larger letter involving a personal dispute bears

on whether the form and context of the communication support the conclusion the

speech at issue addresses a matter of public concern. *Id.* at 860 n.26. This court

> must consider not only the content, but also the context and purpose.
> For example, speech that would ordinarily trigger a public concern is
> not protected if the employee's primary purpose was to air a personal
> dispute. So even when the content might otherwise involve a public
> concern, an official must determine whether the employee had been
> trying to expose misconduct or to address a personal dispute. Given the
> inherent uncertainty in that determination, we've held that officials
> enjoy qualified immunity when they reasonably regard a plaintiff's
> primary motive as personal even when the content of the plaintiff's
> statement involves a public entity's improper conduct.

*Avant*, 104 F.4th at 209 (citations and quotations omitted).[13] Thus, even as to the

discrete question of the existence of speech touching on a matter of public concern,

---

[13] Of course, this question is further complicated by the entirely tenuous nature of the speech restriction identified by Cooper: the canoe analogy. The only basis set out in Cooper's response in opposition to summary judgment for treating the canoe analogy as a speech restriction governing her proposed letter to the Governor is the following: "Jones testified that he had previously indicated that members of the highway patrol needed to get in the canoe or they would be 'dealt with.'" At no point, however, does Cooper produce evidence she heard or was aware of the "dealt with" language. And, in any event, the cited portions of Jones's deposition testimony do not reasonably support the interpretation Cooper places on this language. Jones explained that "dealt with" did not mean "terminated," but instead meant "addressed, spoken to an individual that is outside the boundaries of our policy, counsel, not necessarily disciplined but say this is the policy, you're outside the boundaries of that. So I would just say managed, addressed instead of—addressed." In an apparent effort to support the contention Jones's canoe analogy was a speech restriction, Cooper's opening brief asserts Jones "conceded" employees who did not get in the canoe were eventually terminated. The problems with this line of argument are legion. At no point in her summary judgment briefing in the district court did Cooper refer to the terminations of other employees to support the contention the canoe analogy amounted to a speech restriction. Because she did not discuss those terminations, she also did not discuss the circumstances surrounding those terminations, leaving the

Cooper is wrong in asserting that her bare reference to *Wulf* satisfied her burden on establishing clearly established law. *See, e.g.*, *Duda v. Elder*, 7 F.4th 899, 919 (10th Cir. 2021) (concluding *Wulf* clearly established a First Amendment retaliation claim only after noting important factual parallels between the speech and context at issue there and the speech and context at issue in *Wulf*).

Upon de novo review, this court has no doubt the district court correctly concluded Cooper failed to carry her initial burden of demonstrating a clearly established violation of her First Amendment speech rights. Thus, the district court correctly granted Jones qualified immunity as to this claim.

### III. CONCLUSION

For those reasons set out above, the judgment of the United States District Court for the District of Kansas in favor of Kansas and Jones is **AFFIRMED**.

Entered for the Court

Michael R. Murphy
Circuit Judge

---

identified summary judgment record devoid of any indication those terminations are relevant to Cooper's speech suppression claim.

32